UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA


KAYLA M. MONROE,                                         CIVIL NO.  10-3739 (MJD/JSM)

        Plaintiff,

v.                                                      REPORT AND RECOMMENDATION

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.


The above matter is before the undersigned United States Magistrate Judge on plaintiff's Motion for Summary Judgment [Docket No. 8] and defendant's Motion for Summary Judgment [Docket No. 17].  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

For the reasons discussed below, it is recommended that plaintiff's Motion for Summary Judgment be **GRANTED** and that defendant's Motion for Summary Judgment be **DENIED**.

## I.      PROCEDURAL BACKGROUND

Plaintiff Kayla Monroe ("Monroe") was initially awarded supplemental social security benefits as child on March 1, 1995, when she was five years old, on the basis that she was retarded and suffering from post-traumatic stress disorder ("PTSD").  Tr. 26.  When Monroe attained the age of 18, she underwent a reevaluation for the eligibility of disability benefits under the disability criteria for adults.  Tr. 90.  The Social Security Administration ("SSA") concluded that Monroe was no longer disabled as of April 1, 2008.  Tr. 56-59, 90-94.  The redetermination was upheld upon reconsideration.

Tr. 89, 95-109.   Monroe, who was represented by a non-attorney representative, received a hearing before Administrative Law Judge ("ALJ") David B. Washington on May 1, 2009.  Tr. 16, 398.  Testimony was taken at the hearing from Monroe, German Benetiz ("Benetiz") who is Monroe's boyfriend, and neutral vocational expert ("VE") Mitchell Norman.  Id.  On June 23, 2009, the ALJ issued a decision denying Monroe benefits, finding that her disability ended on April 1, 2008, and that she has not become disabled again since that date.  Tr. 24.  The Appeals Council denied Monroe's request for review and upheld the ALJ's decision denying benefits to Monroe, making the ALJ's findings the final decision of defendant.  Tr. 4-6.  See 42 U.S.C. § 405(g).

Monroe sought review of the ALJ's decision by filing the instant action with this Court pursuant to 42 U.S.C. § 405(g).  The matter is now before the Court on plaintiff's Motion for Summary Judgment [Docket No. 8] and defendant's Motion for Summary Judgment [Docket No. 17].

## II.     PROCESS FOR REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability."  Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); 42 U.S.C. § 1382(a).  The Social Security Administration shall find a person disabled if the claimant "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 1382c(a)(3)(A).  The claimant's impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."   42 U.S.C.

§ 1382c(a)(3)(B).  The impairment must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A); see also 20 C.F.R. §§ 404.1509, 416.909.

### A.   Administrative Law Judge Hearing's Five-Step Analysis

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision.  20 C.F.R. §§ 404.907-09, 416.1407-09.  A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ.  42 U.S.C. §§ 405(b)(1), 1383(c)(1); 20 C.F.R. §§ 404.929, 416.1429.  To determine the existence and extent of a claimant's disability, the ALJ must follow a five-step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's work history, impairment, residual functional capacity, past work, age, education and work experience.  See 20 C.F.R. §§ 404.1520, 416.920; see also Locher, 968 F.2d at 727.  The Eighth Circuit described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003).

### B.   Appeals Council Review

If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, though review is not automatic.  20 C.F.R. §§ 404.967-

404.982, 416.1467-1482.  The decision of the Appeals Council (or of the ALJ, if the request for review is denied) is final and binding upon the claimant unless the matter is appealed to Federal District Court within sixty days after notice of the Appeals Council's action.  42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

### C.    Judicial Review

Judicial review of the administrative decision generally proceeds by considering the decision of the ALJ at each of the five steps.  The Court is required to review the administrative record as a whole and to consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of plaintiff's impairments.

6. The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth plaintiff's impairment.

Cruse v. Bowen, 867 F.2d 1183, 1185 (8th Cir. 1989) (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

The review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); Bradley v. Astrue, 528 F.2d 1113, 1115 (8th Cir. 2008); Johnson v. Apfel, 210 F.30 870, 874 (8th Cir. 2000); Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996).  "We may reverse and remand findings of the Commissioner only when such findings are not supported by substantial evidence on the record as a whole."  Buckner v. Apfel, 213 F.3d 1006, 1012 (8th Cir. 2000) (citation omitted).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Buckner, 213 F.3d at 1012 (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)); see also Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009) (citing Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)) (same); Cox v. Apfel, 160 F.3d 1203, 1206-07 (8th Cir. 1998) (same).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. Culbertson, 30 F.3d at 939. The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. Buckner, 213 F.3d at 1011; Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding). Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Apfel, 811 F.2d 1195, 1199 (8th Cir. 1987); see also Heino v. Astrue, 578 F.3d 873, 878 (8th Cir. 2009) (quoting Jackson v. Bowen, 873 F.2d 1111, 1113 (8th Cir. 1989)) (same).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act.  See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991).  Once the claimant has demonstrated he or she cannot perform prior work due to a disability, the burden of proof then shifts to the Commissioner to show that the claimant can engage in some other substantial, gainful activity.  See Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004); Martonik v. Heckler, 773 F.2d 236, 239 (8th Cir. 1985).

## III.   DECISION UNDER REVIEW

The ALJ concluded that Monroe was not eligible to continue receiving supplemental security income upon attaining the age of 18 under section 1614(a)(3(H) of the Social Security Act.  Tr. 24.  The ALJ based this decision on the following findings:

> 1.     The claimant attained age 18 on November 29, 2007 and was eligible for supplemental security income benefits as a child for the month preceding the month in which she attained age 18. The claimant was notified that she was found no longer disabled as of April 1, 2008, based on a redetermination of disability under the rules for adults who me new applications.
>
> 2.     Since April 1, 2008, the claimant has had the following severe impairments: mild mental retardation; and post traumatic stress disorder (20 CFR 416.920(c)).
>
> 3.     Since April 1, 2008, the claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.925 and 416.926).
>
> 4.     Since April 1, 2008, the claimant has had the residual functional capacity to ·perform a full range of work at all exertional levels but with the following nonexertional

limitations: simple, 3-to-4 step instructions and tasks in unskilled work.

5.    The claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

6.    The claimant has no past relevant work (20 CFR 416.965).

7.    The claimant was born on November 30, 1989 and is a younger individual age 18-44. (20 CFR 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

9.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

10.    Since April 1, 2008, considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

11.    The claimant's disability ended on April 1, 2008, and the claimant has not become disabled again since that date (20 CFR 416.987(e) and 416.920(g)).

Tr. 18-24.

## IV.    THE RECORD

### A.    <u>Background</u>

On May 20, 1998, Polk County Public Schools in Florida, developed an Individual Education Plan ("IEP") for Monroe.  Tr. 146.  The IEP noted that Monroe had attention deficit disorder and was taking Ritalin.  <u>Id.</u>  Staff determined that Monroe was "educable mentally handicapped."  Tr. 148.

On July 21, 2007 Monroe obtained her GED and had completed one year in college. Tr. 41, 402.

On October 11, 2007, Monroe filled out a continuing disability review report in which she represented that she was going to school full time and was a full time mom. Tr. 44.  Monroe also stated that she had no difficulty dressing, bathing, caring for her hair, taking medicine, preparing meals, feeding herself, performing chores inside and outside the house, using transportation, shopping, managing money, walking, standing, lifting, using arms, using hands, using fingers, sitting, seeing, hearing or speaking, concentrating, remembering, understanding or following directions, completing tasks, and getting along with people.  Tr. 45-46.  Monroe described her hobbies as watching television for at least one-to-two hours per day and playing on a computer for least one-to-two hours per day.  Tr. 46.

On January 2, 2008, Michelle Woodward ("Woodward"), Monroe's mother, filled out a third party function report for Monroe.  Tr. 48.  Woodward reported the following information about Monroe.  Woodward saw Monroe 4 to 6 days per month.  Id.  Monroe lived and took care of her one-and-half year old daughter. Tr. 48-49.  Woodward characterized Monroe as a slow learner.  Tr. 49.  She also stated that Monroe needed reminders to brush her teeth and hair and to change her clothes.  Tr. 50.  Monroe was able to prepare meals, although it took Monroe a long time to cook, and many times the food was either undercooked or burnt.  Id.  Monroe did as little housework as possible, but her house cleaning was "o.k."  Id.  Monroe was able to drive a car, shop in stores for food and clothing, pay bills, handle a savings account, sometimes count change, and sometimes use a checkbook.  Tr. 51.  Monroe's hobbies included watching the television and using the computer, she talked on the phone and visited with people two

to three times a week, but Woodward noted that sometimes Monroe became angry.  Tr. 52-53.  Woodward believed that Monroe's condition affected her memory, ability to complete tasks, concentration, understanding, and ability to follow instructions.  Tr. 53. Woodward also believed that Monroe was not able to think straight at times.  Id. Woodward opined that Monroe was able to concentrate for 30 minutes to 1 hour at a time, and was sometimes able to follow written and spoken instructions, she had a "good" ability to get along with authority figures, and had problems handling stress and changing her routine.  Tr. 53-54.  Woodward noted no unusual behavior or fears for Monroe.  Tr. 54.  In her remarks, Woodward stated that Monroe was a slow learner, she could not read well, could not handle stress well and could not concentrate.  Tr. 55.

On April 3, 2008, Monroe began working for Maxim Health Services as a home health aide.  Tr. 185-87.  The requirements for this position included a high school diploma or its equivalent, the ability to read proficiently in English, a current driver's license, a current CPR card, and successful completion of a screening exam with a score of 80% or greater.  Tr. 187.  The position responsibilities included: providing hygienic care for patients; moving and transferring patients; providing assistance with patient exercises; assisting patients with dietary needs (including preparing meals); serving meals; ensuring that patients get enough nutrition and fluid intake and washing dishes; providing for a safe and sanitary environment for patients; conducting basic infection control techniques; and taking and recording vitals, such as temperature, blood pressure, pulse and respiration.  Tr. 187-88.

On November 21, 2008, Monroe filled out another function report.  Tr. 73-80. Monroe indicated that her typical day involved waking up, changing her daughter's diaper and making her breakfast, then watching a little television before running an

errand, coming home and putting the baby down for a nap, making dinner, giving the baby a bath and then going to bed. Tr. 73. The care Monroe provided to her two-year-old daughter included feeding, bathing and providing her with love, clothes and toys. Tr. 74. Monroe noted that she received help taking care of her daughter from a friend who watched the baby when she went out on appointments, shopping or to the hospital. Id.

Monroe stated that her condition caused her to forget to change her clothing sometimes, and that sometimes she did not know what to feed herself or how to cook. Tr. 74. Monroe also stated that she was still working on basic math problems and if she did not know how to solve a problem, she got very mad. Id. She noted that she was afraid to be alone. Id.

Monroe provided that sometimes she needed help with preparing meals and reminders for brushing her teeth, sometimes she did not like taking her medications and would sometimes forget if she took them. Tr. 75. Examples of meals Monroe prepared included, frozen meals, sandwiches, pizza, fried food, baked food, vegetables and strawberry shakes. Id. Monroe prepared meals daily or ate leftovers. Id.

As for housework, Monroe did the laundry, mopping, sweeping, cleaning dishes and raking, although she claimed that sometimes she would forget to take out the trash or clean the house. Tr. 75. Her hobbies included watching baby shows, playing video games, visiting friends, watching her daughter play outside and going to the mall. Tr. 77. Monroe's social activities included daily visits to her neighbor's house and talking on the phone with family and friends. Id. She also went to her friend's house and Walmart on a regular basis. Id.

According to Monroe, she would sometimes forget an appointment and she only needed someone to accompany her to places if she needed a ride. Tr. 77. Monroe

believed that her abilities were limited as she would forget appointments, would not always compete tasks, was not able to concentrate well, she had a problem getting distracted or confused, and she had a problem understanding others.  Tr. 78.  At the same time, Monroe indicated that she could pay attention as long as she did not become confused or distracted.  Id.  Sometimes Monroe had problems with following written instructions, and she could follow spoken instructions if they did not require her to remember a lot.  Id.

Monroe did not have a problem with authority figures, except that sometimes she was nervous around police officers, although she stated that she was very respectful towards the police.  Tr. 79.  Monroe noted that sometimes she did not handle stress well and that she did her best to get used to changes in her routine.  Id.  While Monroe had problems remembering, she used pens, paper and an alarm clock to help her follow instructions and remember appointments.  Id.

On the same date, Benetiz filled out a third party function report for Monroe.  Tr. 81.  Benetiz indicated that Monroe's typical day involved waking up, changing her daughter's diaper and making her breakfast, then watching a little television, giving the baby lunch and putting her down for a nap, going shopping, doing laundry and cleaning dishes, and going to sleep.  Tr. 81.  Benetiz stated that Monroe took care of her two-year-old daughter and gave her everything she needed such as food, affection, love, clothes and toys.  Tr. 82.  Benetiz helped Monroe by giving her rides and advice.  Id.

Benetiz noted that Monroe sometimes wore the same clothing or clothing that was "broken" or dirty.  Tr. 82.  On the other hand, he found that she had no problems bathing, caring for her health or shaving.  Id.

Monroe was able to prepare daily meals, which took her longer than a "regular person," but she did better with instruction or with supervision.  Tr. 83.  At the same time, Benetiz stated that Monroe was frequently undecided on what to cook and eat at home, and that she had a problem with being aware of the dangers posed by heat and sharp objects.  Tr. 82.  Sometimes Monroe needed advice on what to cook, reminders on avoiding being burned or hurt during cooking, and needed to be reminded to brush her teeth.  Tr. 83.  Monroe did household chores every few days, but sometimes she did not notice that her house was dirty or smelled due to diapers in the garbage.  Id.

Monroe was able to go out to shop and could drive a car.  Tr. 84.  Benetiz also opined that Monroe was able to pay her bills, handle a savings account and use a checkbook, and that although she sometimes had a problem with counting coins, she tried to do her best to manage her money carefully.  Id.

Benetiz indicated that Monroe's daily hobbies included watching television, playing video games and sharing time with friends.  Tr. 85.  Monroe was able to visit with family, friends and neighbors, talk on the phone and communicate on the computer.  Id.  Monroe needed to be reminded of appointments.  Id.

According to Benetiz, Monroe had poor math skills, was a slow learner, would get frustrated when she could not do things "regular people could."  Tr. 82.  In addition, she exhibited poor speech and vocabulary and was afraid of being alone.  Id.  Benetiz found that Monroe did not like taking her medicine, unless she was in pain, and she was unable to keep track of her doses unless she wrote them down.  Tr. 83.  In Benetiz's opinion, Monroe's memory got in the way of her ability to complete tasks, her concentration was not good, she would get confused or distracted, she sometimes had problems understanding instructions or new material, and did not say "hi", "please" or

"excuse me" like normal individuals.  Tr. 86.  Monroe had to pay close attention to written instructions and would get confused with written instructions.  Id.  She was able to handle spoken instructions, as long as they were not complicated or did not require a lot of memorization.  Id.

Benetiz found Monroe to be respectful with authority figures and paid close attention to them, but sometimes she became nervous around police officers.  Tr. 87.  Benetiz noted that Monroe at times would start to cry and would be stressed when she would remember being raped as a child and would need convincing to help her reason and deal with the stress.  Id.

On May 8, 2009, Monroe's former neighbor for 9 months, Marianne Boley ("Boley"), sent an email to Monroe's social security advocate.  Tr. 367.  Boley stated that within the first week of living next to Monroe, she was asked to help Monroe out.  Id.  During one instance, Boley had to help get Monroe out of a state of depression after she had a dream about what happened to her when she was a child.  Id.  Boley also noticed that Monroe sometimes had difficulty keeping her mind on what she was doing.  Id.  In addition, Boley noticed that Monroe's "slow learning disability are to me what a 4th or 5th grade student would be at."  Id.

Boley indicated that she had to help Monroe on many occasions get her child in and out of a car because she was unable to do so on her own.  Id.  Boley also went over to Monroe's home on many occasions to look after her daughter and to help her clean her kitchen.  Id.  Further, Boley had to accompany Monroe to places because Monroe did not want be alone.  Id.  Boley had witnessed Monroe's depression, which got to the point that Monroe would sit in a complete daze while someone was talking to her.  Id.  Boley also noted that there were a number of times where she and Monroe

would go to a store and as soon as Monroe got home, she realized she forgot an item and would have to go back repeatedly.  Id.

### B.   Medical Records

On March 17, 1995, when Monroe was five years old, Monroe underwent an evaluation as part of her in-patient admission at Winter Haven Hospital arising out of problems of dangerous and aggressive behaviors, sexual acting out, potential neglect and sexual abuse victimization.  Tr.  342.  The diagnosis for Monroe was PTSD and sexual abuse victimization.  Id.

Throughout March of 1995, Monroe underwent a psychological evaluation during her inpatient treatment.  Tr. 338.   Monroe demonstrated a verbal IQ of 63, a performance IQ of 63 and a full scale IQ of 59.  Tr. 339.  With regards to achievement testing, Monroe was consistently testing at an approximately three-year-old level.  Tr. 349.  The results of the testing showed that Monroe may have been functioning in the mildly retarded range of general intellectual ability and was functioning well below her chronological age.  Tr. 341.

Monroe's March 24, 1995 discharge diagnosis from inpatient treatment was as follows:

> AXIS 1: (1) Post traumatic stress disorder.
>          (2) Developmental speech and language disorder.
>
> AXIS 2: Mild mental retardation.
>
> AXIS 3: Upper respiratory infection.

Tr. 350.

On May 19, 1995, Monroe was admitted to the Peace River Center for Personal Development for treatment, due to being sexually abused for three years.  Tr. 353-357.

The impression by a licensed social worked was that Monroe was suffering from PTSD and mild mental retardation.  Tr. 357.

In 1997, when Monroe was seven years old, she underwent a psychological evaluation through school, due to concerns that she was unable to remember instructions, facts, basic letters and vocabulary.  Tr. 192.  The evaluation noted that a previous 1995 evaluation indicated that Monroe was functioning in the mildly retarded range of general intellectual ability.  Tr. 193.  In addition, the evaluation mentioned a March 16, 1995 hospital intake form that listed PTSD as her principal diagnosis and mildly mental retardation, along with a language disorder, as a secondary diagnosis.  Id. Monroe was taking medication for her hyperactivity.  Tr. 194.  Monroe was found to be functioning in the intellectually deficient borderline range, with a verbal IQ of 78 a performance IQ of 59 and a full scale IQ of 66.  Tr. 195.  Monroe also displayed a low-level of ability in mathematics and written language skills and a borderline ability, for her age, concerning her reading skills.  Id.  Monroe's adaptive behaviors were consistent with her overall cognitive ability.  Tr. 196.  The school psychologist recommended lowering Monroe's instructional levels and breaking down her work into smaller units. Id.  Irvine found that Monroe was likely to require more repetition of direction and practice to master content.  Id.

In May 1998, when Monroe was 8 years old and in second grade, she again underwent a psychological evaluation through school.  Her grades during that school year were all C's (average) and D's (below average).  Tr. 359.  On standardized testing, Monroe only scored in the 1st percentile in vocabulary and comprehension.  Id.  Monroe was still on medication for her attention-deficit hyperactivity syndrome.  Id.  The testing

under the Woodcock-Johnson Psycho-Educational battery showed that Monroe's age scores ranged between the 2 through 14 age percentile.  Tr. 362.

On March 18, 2008, when Monroe was 18 years old, she underwent a psychological evaluation by Psychologist Gerald Hodan, Ph.D. ("Dr. Hodan"), in order to evaluate her level of intellectual functioning as part of the review of her disability status. Tr. 150.  Dr. Hodan noted that in May 1998, it was determined by a psychiatrist that Monroe was functioning somewhere with the mildly retarded range of abilities and appeared to be functioning well below her chronological age.  Id.  Monroe stated that she had been raised by her mother and raped by her stepfather at the age of two.  Id. Monroe told Dr. Holden that she did very well in school but that she was in special classes.  Id.  Monroe dropped out because of her pregnancy, but she managed to get her GED.  Id.  Monroe's mother was taking care of her child at the present time.  Id. Monroe noted that she was working as a CNA (certified nurses assistant), which she enjoyed, but her goal was to go to college and become a midwife.  Id.  Monroe reported enjoying going to the mall, shopping and swimming, but that she did not have any friends with whom she associated.  Tr. 151.  The only mental health treatment reported involved seeing a therapist when she was very young.  Id.

Monroe told Dr. Hodan that she slept well, had a good appetite and was happy. Tr. 151.  She never suffered from symptoms of depression, anxiety, or severe mood swings.  Id.  She reported no experience to suggest hallucinations or delusional thinking.  Id.  She told Dr. Hodan she was going to get her daughter back living with her, which made her even happier.  Id.

Monroe presented at the appointment with Dr. Hodan dressed in casual, appropriate, clean-appearing clothing and with good personal grooming and hygiene.

Tr. 151.  No motor or coordination problems were noted.  Id.  Monroe sustained eye contact and was very pleasant and cooperative in her attitude and spontaneous in communication.  Id.  Her speech was clear and understandable with normal rate and volume.  Id.  Monroe's mood did not suggest significant depression or unusual anxiety, her affect was appropriate to thought content with good range.  Id.  There was no indication of perpetual distortions or any formal thought disorder.  Id.

Monroe's WAIS-II score did indicate mild retardation based on her full scale IQ 65, her verbal IQ of 70 and verbal comprehension index of 70, fell within the lowest limit of the borderline range.  Tr. 151-52.

Based on all of this information, Dr. Hodan concluded that Monroe functioned within the upper limits of the mildly retarded range of abilities and as result, she was likely to have some difficulties coping with the many stressors in life.  Tr. 152. According to Dr. Hodan, there did not appear to be any evidence for a severe mental disorder that would preclude her from being gainfully employed in some capacity.  Id. Dr. Hodan did find that Monroe's limited cognitive abilities indicated that she was best suited for employment that was simple, repetitive, routine without a lot of stress being placed upon her.  Id.  Dr. Hodan noted that Monroe was able to maintain good personal grooming and hygiene and would be able to present herself for work.  Id.  Dr. Hodan also found Monroe to be very pleasant, friendly and cooperative, which he believed suggested that Monroe was capable of developing and maintaining smooth relationships with coworkers in a work setting.  Id.

Dr. Hodan provided the following diagnostic impression of Monroe:

AXIS I              None

AXIS II             317    Mild Mental Retardation

AXIS III             Refer to any available medical records

Tr. 152.  To the extent that Monroe was awarded benefits, Dr. Hodan cautioned that Monroe had limited math skills.  Tr. 153.  Dr. Hodan believed that Monroe could only manage her money on a very simple level and could be taken advantage of by others. Id.

On March 28, 2008, state psychologist Author Hamlin ("Dr. Hamlin") conducted a psychiatric review of Monroe's record.   Tr. 154.   Under Listing 12.05 for "Mental Retardation," Dr. Hamlin found that Monroe displayed significantly subaverage intellectual functioning with deficits in adaptive functioning that initially manifested itself before the age of 22 with a valid verbal, performance, or full scale IQ of 60 through 70. Tr. 158.  Dr. Hamlin also determined that Monroe had no difficulties in maintaining social functioning; no episodes of decompensation of an extended duration; a moderate restriction of activities of daily living; and moderate difficulties in maintaining concentration, persistence or pace.  Tr. 164.

Dr. Hamlin noted that Monroe's most current testing showed a verbal IQ of 70, performance IQ of 64 and full-scale IQ of 60.  Tr. 166.  He noted there was a diagnosis of mild mental retardation with no secondary mental diagnosis, no psychiatric care records, and Monroe had a relatively normal mental status.  Id.  In reaching his conclusions, Dr. Hamlin also relied on third party reports that Monroe took care of her baby, engaged in independent hygiene care, prepared simple foods, did some housework, drove, shopped for food and clothing, was able to count change, used the computer, watched the television, sometimes had angry outbursts and possessed a variable ability to follow instructions.  Id.  Dr. Hamlin's conclusion was mild mental

retardation with only moderate limitations and restrictions of activities of daily living, and moderate difficulties in maintaining concentration, persistence or pace.  Id.

As to Monroe's RFC, Dr. Hamlin concluded that Monroe was not significantly limited in the following abilities: remember locations and work-like procedures; understand and remember very short and simple instructions; carry out very short and simple instructions; perform activities within a schedule and maintain regular attendance; sustain an ordinary routine without special supervision; work in coordination with others without being distracted;  make simple work-related decisions; complete a normal work day and week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of rest periods; interact appropriately with the general public; ask simple questions or seek assistance; accept instructions and respond appropriately to criticism; get along with coworkers and peers without distracting them; maintain socially appropriate behavior and adhere to standards of neatness and cleanliness; be aware of hazards and take appropriate precautions; travel; and set realistic goals or make plans independently of others.  Tr. 168-69.  Dr. Hamlin found that Monroe was moderately limited in her ability to maintain attention and concentration for extended periods and to respond appropriately to changes in the work setting.  Id.  Monroe was found to have marked limitations in her ability to understand and carry out detailed instructions.  Tr. 168.

Dr. Hamlin noted that while Monroe's IQ was very low, her adaptive skills were much higher.  Tr. 170.  Monroe appeared to be working as a CNA prior to the return of her baby and Hamlin saw no indication in Monroe's updated daily activities that she lost the job because she was unable to perform or get along with others.  Tr. 170.  Monroe was able to take care of her child without much assistance, except for needing rides to

places, she could go out alone, shop and drive, and Dr. Hamlin found no mental or physical impairment.  Id.  According to Dr. Hamlin, Monroe's adaptive behaviors should translate into doing routine and repetitive tasks despite her low IQ scores.  Id.  Dr. Hamlin's psychiatric review and RFC determination were affirmed by state psychologist Thomas L. Kuhlman.  Tr. 154, 168.

On January 30, 2009, Monroe presented herself to healthcare providers with a chief complaint of pain secondary to pregnancy.  Tr. 267.  During this visit, Dr. Kevin R. Vanderveen, M.D. observed that Monroe spoke in full sentences and answered questions appropriately.  Id.

During a January 29, 2009 physical therapy evaluation regarding Monroe's lower back pain, Monroe told the physical therapist that she was unlimited in her ability to engage in cooking and cleaning activities.  Tr. 227.  The physical therapist noted that Monroe had difficulty following questions, but indicated that she was very pleasant and cooperative with physical therapy.  Id.  While Monroe reported to the physical therapist that she had a learning disability, the physical therapist reported that she appeared to have no barriers with the exercises given to her.  Tr. 228.  The physical therapist also reported that Monroe learned best with pictures, listening and demonstrations, and was given written instructions and pictures for her exercises.  Id.

On February 20, 2009, Monroe was seen by licensed social worker Joel Bobby ("Bobby") for an evaluation based on a referral from her nurse practitioner.  Tr. 247. Monroe was pregnant with her second child at the time of the appointment and she was living with her boyfriend, the father of her unborn child.  Tr. 247, 249.  Monroe reported that she had been on social security benefits for most of her life due to a learning disability, and was looking for a verification of a learning disability in order to maintain

her social security benefits.  Tr. 247.  Monroe was not interested in psychotherapy, but was instead looking for a diagnosis that could help her obtain social security benefits. Tr. 247-48.  Specifically, Monroe wanted to prove to her attorney that she was still disabled.  Tr. 248.  Monroe also reported that she had worked three months in the previous year as a home health aide and her benefits were taken away from her at that time.  Id.

Monroe told Bobby that she was raped when she was two years old and the abuse continued for some time.  Tr. 248.  Monroe claimed that since the abuse, she has had difficulty functioning in many areas of her life, including not being able to sleep alone in the dark, academic problems, she has not been social, and she had memory loss, sleeping problems and a fear that someone was coming to get her.  Id.

Monroe denied any present depressive symptoms and stated that she did not typically feel any anxiety.  Id.  She also denied ever being hospitalized for mental health issues and she had never attempted to harm herself or others.  Tr. 249.

During Bobby's assessment, Monroe appeared to have a level of functioning that was in the low-average range based on her use of vocabulary and her slow speech.  Tr. 248.  Monroe was not taking any medications at the time of the assessment.  Tr. 250.

Bobby found Monroe to be pleasant and cooperative during the assessment.  Id. Monroe reported nightmares in which someone was trying to get her or touch her.  Id. Monroe appeared to be orientated in all spheres.  Id.  Monroe's intellectual functioning appeared to be in low-average range based on her vocabulary use and her writing skills.  Id.  Bobby observed no overt psychotic processes occurring and her judgment appeared to be good.  Id.  Bobby's initial diagnosis for Monroe was as follows:

> Axis 1
> Post-traumatic stress disorder

Learning disorder, not otherwise specified, provisional.

Axis 2
Rule out low IQ

Axis 3
Defer to medical staff.

Axis 4
Employment, anticipated concerns due to SSI.
Family of origins stressors

Axis 5
Current GAF of 50 to 55.[1]

Tr. 247.

On February 24, 2009, Monroe was seen by psychologist Timothy Lang ("Lang").

Tr. 245.  Lang reported that Monroe was seeking social security benefits.  Id.  The

WASI was administered to Monroe in order access her cognitive skills and abilities.  Id.

Monroe obtained a full-scale IQ of 64, which was in the mildly mentally retarded range.

Id.  Both her verbal IQ score of 68 and performance IQ of 66 fell within the mildly

mentally retarded range.  Id.  Monroe also exhibited deficiencies in her verbal reasoning

skills and in her ability to assemble blocks into geometrical designs.  Id.  Lang found

that Monroe was cooperative with her evaluation, she put forth reasonable effort and

was motivated to perform well.  Tr. 246.  Lang believed that the evaluation was an

accurate depiction of Monroe's current cognitive skills and abilities.  Id.

---

[1]     The GAF scale is used to assess an individual's overall level of functioning.
Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 662 n.2 (8th Cir. 2003) (citing the
Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. 2000 Revision)).  The
lower the score, the more serious the individual's symptoms.  See id.  "GAF scores of
51-60 indicate 'moderate symptoms (e.g., flat affect and circumstantial speech,
occasional panic attacks) OR moderate difficulty in social, occupational, or school
functioning (e.g., few friends, conflicts with peers or co-workers).'"  Id.  GAF scores of
41 to 50 reflect "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals,
frequent shoplifting) OR any serious impairment in social, occupational, or school
functioning (e.g., no friends, unable to keep a job)."  Id.

On March 19, 2009, Monroe had a psychotherapy session with Bobby.  Tr. 248. Monroe told Bobby that her attorney advised her to meet with a therapist at least four times before her court hearing for benefits.  Id.  During the therapy session, Monroe stated that she was afraid at night, mostly when her boyfriend was working the night shift.  Id.  She expressed her fear that someone was going to break into her home and hurt her daughter.  Id.  Monroe understood Bobby's explanation that her fear had probably increased since her daughter was at that time the same age as when Monroe had been assaulted.  Id.  Monroe reported to Bobby that she realized that any noises she heard at night were simply her fear and that it was not real.  Id.  Bobby noted that Monroe appeared to cope with the sadness she felt for her dead aunts.  Tr. 244.

During the session, Monroe was casually dressed, had good hygiene and was well groomed.  Id.  Bobby stated that Monroe's affect was appropriate to the topics discussed, in that she was tearful when appropriate and smiled and laughed when appropriate.  Id.  Monroe did not endorse any suicidal or homicidal thought.  Id. Bobby's assessment of Monroe was PTSD at Axis I and mild mental retardation at Axis II.  Tr. 243.

On April 14, 2009, Bobby filled out a Mental Impairment Questionnaire for Monroe.  Tr. 304-309.  Bobby's DSM-IV evaluation for Monroe was PTSD at Axis I, mild mental retardation at Axis II, a current GAF of 50-55 and that her highest GAF (over the previous year) was 55-60.  Tr. 304.  Bobby did not list any medications that Monroe was taking at the time.  Id.  Bobby's assessment of Monroe was based on her fear of sleeping alone in the dark, memory loss, intrusive memories and thoughts, academic difficulties, and impaired functions in various life areas.  Id.  Bobby's prognosis for Monroe was fair to good.  Id.

Bobby found that Monroe had unlimited or very good ability to remember work-like procedures, understand and remember very short an simple instructions, carry out very short an simple instructions, maintain attention for a two hour segment, make simple work-related decisions, ask simple questions or request assistance, get along with co-workers, interact appropriately with the public, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, travel to an unfamiliar place, and use public transportation.  Tr. 306-07.

Bobby found that Monroe had a limited but satisfactory ability to maintain regular attendance and be punctual, sustain an ordinary routine without special supervision, work in proximity with others without being distracted, perform at a consistent pace without an unreasonable number of breaks, accept instruction and criticism from supervisors, respond appropriately to changes in work routine, deal with normal work stress, be aware of normal hazards, and set realistic goals or make plans independently of others.  Id.

Bobby opined that Monroe was seriously limited but not precluded from completing a normal workday without interruptions from psychological symptoms.  Tr. 306.  Bobby explained this finding as follows: "I'm not sure Kayla has stamina to complete 'normal' 8-hour or 40-hour day/week."  Id.  In addition, Bobby found that Monroe was seriously limited but not precluded from understanding and remembering detailed instructions, carrying out detailed instructions, and had somewhere in between a limited but satisfactory-to-seriously limited but not precluded ability to deal with stress in semiskilled and skilled work.  Id.  Bobby made these findings based on Monroe's self-reported memory problems, low IQ and low coping skills.  Id.

Bobby also found that Monroe had mild to no restrictions of daily living, moderate difficulty in maintaining concentration, persistence or pace; and no episodes of decompensation.  Tr. 307.  Bobby noted no chronic organic mental or other affective disorder for Monroe that would limit her ability to do basic work activity.  Tr. 308.  Further, Bobby noted no anxiety-related disorder that rendered Monroe incapable of functioning adequately outside of her home.  Id.

Bobby concluded that Monroe's impairments would cause her to miss work about three days a month and that Monroe was not a malingerer.  Tr. 309.  Bobby also opined that Monroe was not able to manage any benefits in her own best interest or handle her own finances due to her intellectual level, and her self-reported difficulties with math and memory.  Id.

### C.   Hearing before the Administrative Law Judge

Monroe appeared at a hearing before the ALJ on May 1, 2009.  Tr. 398.  Monroe testified that she was 19 years old and had obtained her GED in 2007.  Tr. 401.  She stated that she obtained her GED in order to go to college and become a registered nurse, but was uncertain if her learning disabilities would let her get that far.  Tr. 402.  Monroe noted that the GED test allowed her to go back and correct her wrong answers.  Tr. 408.  Monroe stated that it took her 10 times to pass her driver's license test and she had help from her step-mother to pass the test.  Tr. 409.

Monroe testified that she was supposed to be working full time at her last job, but that sometimes she would only get 20 hours a week, and some weeks her employer had no work for her; later she testified that her employer allowed to her to take few days off to rest.  Tr. 402-03, 412.  Monroe believed that she did not get enough hours because her employer had hired too many people.  Tr. 403.

Monroe was required to take a battery of tests in order to obtain her last employment and she claimed that she passed five of the tests and failed five of the tests.  Tr. 412.  In order to prepare for the tests, Monroe was allowed to take a book home and read it in order to study.  Tr. 413.

Monroe was taking no medications at the time of the hearing, and noted that she was seeing her counselor Bobby.  Tr. 404.  Monroe acknowledged that prior to meeting with Bobby, she was not seeing a therapist because she was in an unstable place and always on the go.  Tr. 409-10.

Monroe testified that her daily routine involved getting up at 10:00 a.m., making breakfast for herself and her daughter, after which her daughter watched cartoons and played.  Tr. 405.  At about noon, Monroe and her daughter ate lunch, her daughter took a nap and then Monroe played with her.  Tr. 405-06.

Monroe testified that if she was to go back to a nursing assistant type of job, she would need to take a refresher course because she did not have a very good memory.  Tr. 407.  She also believed that she would only be able to work part-time because she would become tired for no reason.  Id.

Monroe was receiving help doing her laundry and dishes due to her pregnancy.  Tr. 406.  Monroe stated that she currently received no help doing anything around the house except for the laundry because she could not carry it up and down the stairs.  Tr. 413-14.  She also testified that she did not need any help with taking care of her child or shopping, even from her boyfriend.  Tr. 414.

Monroe stated that she could not sleep at night without the light from a bathroom light or closet light because she would believe that there were other people in the room.  Tr. 410.  Monroe indicated that she was presently living with her boyfriend, Benetiz, and

that he encouraged her to see a therapist because she was unaware of all her crying and talking in her sleep regarding things that had happened in her past.  Tr. 411.  One time she told her boyfriend that someone was coming to get him and that he needed to jump out of bed and run.  Id.

Monroe testified that she found about her PTSD when she was 12 years old.  Tr. 411.  Monroe described her symptoms of this disorder as curling up in a ball and crying when she sees a scary movie or if she hears about someone being "hit or stuff like that." Tr. 412.

In the first hypothetical to the VE, the ALJ asked the following:

> Let's assume we're discussing a younger person with limited education, who would be limited to simple three, four step unskilled work activity.  Are there any jobs in the regional economy that such a person could perform?

Tr. 415.

The VE found that an injection molding machine tender (DOT number 556.685-038) fit this hypothetical and that there were approximately 3,200 of these positions in Minnesota.  Id.  The VE noted that this position would allow two regular absences per month.  Tr. 425.  The ALJ also inquired about a nursing assistant type of job and the VE testified that this was semi-skilled position with an SVP 4.[2]  Tr. 415.

---

[2]   Defendant indicated that "SVP" stands for "specific vocational preparation."  See Defendant's Memorandum in Support of Motion for Summary Judgment ("Def.'s Mem."), p. 14.  "In the DOT, each job is assigned a number that reflects the job's specific vocational preparation time (SVP), i.e., how long it generally takes to learn the job. . . . [A]n SVP level of "four" would require more than three months and up to six months of training." Fines v. Apfel, 149 F.3d 893, 895 (8th Cir. 1998)  (citing United States Dep't of Labor, Employment and Training Admin., Dictionary of Occupational Titles, Vol. II, Appendix C at 1009).  Unskilled work requires less than thirty days of training and corresponds to an SVP of one or two.  Id. (citations omitted).

After the VE testified, Monroe presented the testimony of her boyfriend, Benetiz. Tr. 416. Benetiz wanted to correct some of the testimony given by Monroe. Tr. 417. He testified that when Monroe cooked, she was undecided on what to cook or sometimes when she was cooking, she was unaware of some dangers, such as being too close to the heat or sharp objects. Id. She also needed help lifting when shopping. Id. Benetiz also testified that because Monroe does not have a Minnesota driver's license, she needed rides to go shopping or to attend appointments. Tr. 418. Benetiz confirmed that Monroe talked in her sleep and would sometimes wake up, curl into a ball, start crying and rock back and forth. Tr. 418, 421. According to Benetiz, during these episodes, she was a different person than the person presently before the ALJ. Tr. 418. These episodes occurred once a month to once every month-and-half, but Benetiz indicated that Monroe was getting better. Id. There have been times when Benetiz was close to bringing Monroe to the hospital in order to force her have a mental health evaluation. Tr. 419.

Benetiz indicated that he knew Monroe when she was working and stated that she would get very tired after having to work three 8-9 hour day shifts in a row. Tr. 419. She was tired due to the lifting and being on her feet all day and because she was not sleeping well. Id.

With regards to Monroe's PTSD, Benetiz noted that Monroe displayed hypervigilance, as she would get startled easily when she heard noises and would sometimes get out of bed to make sure no one was in the house, would check her daughter's room, and would sometimes ask him to check. Tr. 421-22.

Benetiz also testified that he helped watch Monroe's daughter when she was at appointments and that a neighbor also helped watch the child when Monroe was at an

appointment or needed to go shopping.  Tr. 422-423.  The neighbor also helped with doing certain lifting-related tasks, such as getting Monroe's daughter out of the car, laundry and vacuuming, which was due to the pregnancy.  Tr. 423.

With regards to Monroe's memory, Benetiz indicated that she had problems memorizing basic instructions, which was evidenced from her not being able to pass her driver's test and was forgetful of dates.  Id.  Benetiz noted that he set up a system for Monroe to remember appointments by writing her appointments down, along with their respective dates, and using her cell phone alarm to remember.  Tr. 423-24.

## V.   DISCUSSION

Monroe alleged three errors in the Commissioner's decision.  First, the ALJ committed error in finding that the severe impairment of PTSD did not rise to the separate level of a "physical or mental impairment imposing an additional and significant work-related limitation of function" as mandated by the second prong of § 12.05C of the Listings of Impairment.  See Memorandum in Support of Plaintiff's Motion for Summary Judgment ("Pl. Mem."), p. 9.  Second, at Step 3, the ALJ failed to find that her severe impairment of mental retardation met the Listings of Impairments at 12.05C.  Id., p. 11.[3] Third, the ALJ's finding that she could work as a certified nurses assistant with a SVP semiskilled level of 4 was not supported by substantial evidence.  Id.

As to the first error, Monroe claimed that the ALJ misinterpreted §§ 12.00A and 12.05C of the Listings when he concluded that while Monroe's PTSD was severe, it did not impose an additional and significant work-related limitation of function, as both her mild mental retardation and PTDS both restricted Monroe to simple 3-to-4 step

---

[3]     Monroe's second error is basically the same as her first argument; the only substantive difference is that she also asserted the ALJ erred by not considering the statement submitted by Monroe's neighbor.  See Pl.'s Mem., p. 11.

instructions and tasks in unskilled work activity.  Id., pp. 9-10 (citing Tr. 20).  According to Monroe, the Eighth Circuit has interpreted the regulations to find that the additional limitation, in this case PTSD, need not be disabling, but only must have more than a slight or minimal effect on a claimant's ability to work.  Id., pp. 10-11 (citing McNamara v. Astrue, 590 F.3d 607 (8th Cir. 2010); Jones v. Barnhart, 335 F.3d 697 (8th Cir. 2003); Sird v. Charter, 105 F.3d 401, 403 (8th Cir. 1997)).  Because the ALJ found that Monroe's PTSD was a severe impairment, Monroe maintained that it must be concluded that the PTSD imposed more than a slight or minimal effect on her ability to perform work, and therefore, her mild mental retardation and PTSD together met the medical Listing 12.05C. Id., p. 10.

The Commissioner conceded that Monroe has met her burden to show that she has an IQ between 60 and 70.  See Def.'s Mem., p. 19.  However, the Commissioner argued that Monroe has not met her burden to show that the PTSD caused an additional and significant work-related limitation of function on her impairment of mild mental retardation.  Id.  This is because although the PTSD resulted in limitations on her function that were significant, they were not in addition to those caused by her mild retardation.  Id.  Instead, the PTSD impairment caused the same functional limitations – i.e. unskilled, simple three-to-four step instructions and tasks.  Id.

Further, the Commissioner maintained that because Monroe had not shown anything more than mild restrictions in daily activities and social functioning and no decompensation, she had not met the criteria set forth Listing 12.05C.  Id.  According to the Commissioner, Monroe provided no medical evidence to support her assertion that she has experienced any marked limitation in any areas of functioning, and her reliance on a neighbor's report of limited adaptive functioning that merely reiterated Monroe's

subjective complaints of nightmares, forgetfulness and learning disability, could not overcome the findings of Dr. Hodan, her own statements to the agency and her social worker, Bobby. Id., p. 20. In this regard, the Commissioner pointed to the report from Dr. Hodan who noted that Monroe slept well, had a good appetite, felt happy, and functioned in a variety of activities that involved self-care and the care of her child, and found that her mental condition would not interfere with her ability to be employed. Id. In addition, the Commissioner relied on Monroe's statements to Bobby that, "despite her nightmares and other symptoms," she was able to maintain her household for herself and her daughter, shop and provide childcare without much help from others. Id. The Commissioner also relied on the fact that no medical sources in the record opined that Monroe met the 12.05C Listing. Id.

In reply, Monroe argued that the Commissioner's argument that her PSTD impairment was not supported by the evidence in the record ignored the ALJ's finding that the PTSD was a severe impairment, which meant that the ALJ found that the objective medical evidence supported a finding that the PSTD was a severe impairment. See Reply Memorandum [Docket No. 19], p. 2.

The ALJ determined at Step 2 that since April 1, 2008, Monroe has had the severe impairments of mild retardation and post traumatic stress disorder. Tr. 18. The ALJ found that these "impairments cause more than minimal functional limitations." Id. However, at Step 3, the ALJ concluded that Monroe did not meet the Listing 12.05C because she did not have both a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or mental impairment imposing an additional and significant work-related limitation of function. Tr. 20. In reaching this result, the ALJ explained that he:

carefully reviewed the language of this listing and finds that
while the post traumatic stress disorder is another severe
mental impairment, it does not impose an additional and
significant work-related limitation of function in that her mild
mental retardation and PTSD <u>both</u> restrict the claimant to
simple, 3-to-4 step instructions and tasks in unskilled work
activity.

<u>Id.</u> (emphasis added).[4]

If a "claimant has an impairment that meets the medical criteria of a listed

impairment, the claimant is presumptively disabled, and no further inquiry is necessary."

<u>Shontos v. Barnhart</u>, 328 F.3d 418, 424 (8th Cir. 2003).  A "listed impairment" described

at § 12.05C contains three distinct requirements: (1) the claimant must satisfy the

"diagnostic description" set forth in the introductory paragraph of § 12.05; (2) the

claimant must have "[a] valid verbal, performance, or full scale IQ of 60 through 70;" and

(3) the claimant must have "a physical or other mental impairment imposing an

additional and significant work-related limitation of function."  20 C.F.R. Pt. 404, Subpt.

P, App. 1, § 12.05C;[5] <u>see also</u> <u>Maresh v. Barnhart</u>, 438 F.3d 897, 899 (8th Cir. 2006)

---

[4]      The ALJ also found that Monroe did not meet or equal the criteria set forth in
Listings 12.05D or 12.07B.  Monroe did not challenge these findings, and thus, they are
waived.  <u>See</u> <u>Craig v. Apefel</u>, 212 F.3d 433, 437 (8th Cir. 2000); <u>see also</u> <u>Yeazel v.
Apfel</u>, 148 F.3d 910, 911-12 (8th Cir. 1998) (citing <u>Roth v. G.D. Searle & Co.</u>, 27 F.3d
1303, 1307 (8th Cir. 1994)) (finding failure to raise an issue before this Court results in
waiver of that argument).

[5]      Listing 12.05C specifically states in relevant part:

Mental retardation refers to significantly subaverage general
intellectual functioning with deficits in adaptive functioning
initially manifested during the developmental period; i.e., the
evidence demonstrates or supports onset of the impairment
before age 22.

The required level of severity for this disorder is met when
the requirements in A, B, C, or D are satisfied.

* * *

(finding that in order to meet the Listing 12.05C "a claimant must show: (1) a valid verbal, performance, or full scale IQ of 60 through 70; (2) an onset of the impairment before age 22; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function.").

The Commissioner does not deny that Monroe satisfies the diagnostic description set forth in the introductory paragraph of § 12.05 and the first prong of § 12.05C, (Tr. 21; Def. Mem., p. 19), and the record confirms that Monroe has both a full IQ score between 60 and 70 and has demonstrated "mental with deficits in adaptive functioning initially manifested" before she reached age 22.  See Swope v. Barnhart, 436 F.3d 1023, 1024-25 (8th Cir. 2006) (citing Hutsell v. Massanari, 259 F.3d 707, 709, n. 3 (8th Cir. 2001) (stating "[b]orderline intellectual functioning is a condition defined as an IQ score within the 71-84 range, while mental retardation is a score of about 70 or below").   Nevertheless, the Commissioner maintains that the separate and severe impairment of PTSD cannot satisfy the third factor of § 12.05C, which requires a physical or other mental impairment imposing an additional and significant work-related limitation of function.

Under the third requirement, "'the issue is not whether the claimant can perform gainful activity; rather, it is whether he has an . . . impairment, other than his conceded mental impairment, which provides significant work-related limited function'. . . ." Maresh, 438 F.3d at 901 (quoting Sird v. Chater, 105 F.3d 401, 403 (8th Cir. 1997)). According to the Eighth Circuit, the "additional limitation need not be disabling, but it

---

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C.

must have a 'more than slight or minimal effect on [her] ability to perform work.'" McNamara v. Astrue, 590 F.3d 607, 611 (8th Cir. 2010) (quoting Sird, 105 F.3d at 403 (internal quotation omitted)).

Before analyzing Monroe's challenge to the ALJ's determination, it is necessary to review case law and regulations that interpret this third requirement.

In 1986, the Eighth Circuit addressed the issue of what is needed to satisfy the third requirement of § 12.05C. See Cook v. Bowen, 797 F.2d 687 (8th Cir. 1986). In that case, the ALJ found that the additional impairment of chronic neck strain was severe for the purposes of the second step of the ALJ's analysis. Id. at 690. The court quoted two holdings bearing on the determination of whether the "significant limitations standard of section 12.05C has been met: (1) 'where a claimant's impairment is found to be severe under the second step, it automatically satisfies the significant limitations standard of section 12.05C'; and (2) 'the impairment required under the second part of section 12.05C is something less than severe as defined in section 404.1520(c).'" Id. at 690-91 (quoting Nieves v. Secretary of Health and Human Services, 775 F.2d 12, 14 (1st Cir. 1985); Edwards v. Heckler, 755 F.2d 1513, 1515 (11th Cir. 1985)). Like McNamara, the court stated that "an impairment imposes significant limitations when its effect on a claimant's ability to perform basic work is more than slight or minimal." Id. at 690 (citation omitted). The court then concluded that "under either the Nieves or the Edwards test, the evidence and the findings of the ALJ persuade us that Cook has a significant limitation in addition to his I.Q. scores." Id. at 691. The court reversed and remanded back to the Secretary for payment of benefits. Id.

In 1995, <u>Owens v. Shalala</u>, 52 F.3d 330, 1995 WL 242339 (8th Cir. 1995) (table case), the Eighth Circuit rejected the ALJ's and district court's denial of benefits, reasoning:

> In <u>Cook</u>, we held that a finding that an additional physical impairment is severe necessarily means the impairment imposes a significant work-related limitation of function under § 12.05C. <u>Id.</u> at 690-91. Although the ALJ found Owens's spina bifida was severe, the ALJ found the spina bifida did not impose a significant work-related limitation of function. Because these findings are inconsistent under <u>Cook</u>, we conclude Owens's case should be remanded for reconsideration by the Secretary.

1995 WL 242339 at *1.[6]

Next, in <u>Bryant v. Apfel</u>, 141 F.3d 1249 (8th Cir. 1998), the Eighth Circuit analyzed the determination by the ALJ at step two that the plaintiff had a severe impairments of a learning disability and migraine headaches, but that these impairments did not meet or equal a listed impairment. <u>Id.</u> at 1251. The district court determined that even if the plaintiff met the first prong of the mental retardation listing, he did not meet the second prong. <u>Id.</u> at 1252. The Eighth Circuit agreed, rejecting plaintiff's argument that a claimant automatically meets the 12.05C Listing when an ALJ finds that an impairment is severe under step two of the evaluation process, reasoning:

> The second prong of the mental retardation listing, requiring an "additional and significant limitation of function," § 112.05(D) (sic), is met when a claimant has a physical or additional mental impairment that has a more than slight or minimal effect on his ability to perform work. The additional impairment need not be disabling in and of itself but need

---

[6]      Recently, one court in this district concluded that <u>Cook</u> and <u>Owens</u> stand for the proposition that in the context of a challenge under Listing 12.05 "[w]here there is a finding that an additional physical impairment is severe, it automatically imposes significant work-related limitations." <u>Rodgers v. Astrue</u>, NO. CIV. 09-1214 DWF/SRN), 2010 WL 3385086 at *16 (D. Minn. July 14, 2010) (where the ALJ concluded at Step 2 that the claimant's left arm impairment was a severe impairment).

only result in a significant work-related limitation of function to satisfy the adult standard.

Mr. Bryant asserts that Donald Jr.'s headaches have a significant effect on his ability to function sufficient to satisfy the second prong of the listing. He asserts that the ALJ found as much by stating at step two of the evaluation process that Donald Jr.'s learning disability and headaches are severe impairments. We disagree.

At step two, where the ALJ concludes that the learning disability and headaches are severe impairments, the ALJ's imprecise language causes confusion for the reader. We note that later in the decision, however, the ALJ specifically finds at step three that while Donald Jr. has a marked limitation in the cognitive domain, his headaches impose no more than a slight limitation of function. In this manner, the ALJ explains his reasoning more fully. <u>When the ALJ separately analyzes the functional limitations caused by each impairment at step three, we see that the ALJ actually considers Donald Jr.'s learning disability as a significant limitation but views the headaches as no more than a slight limitation of function.</u> The earlier imprecise wording is clarified through the later findings.

<u>Id.</u> (internal citation and marks omitted).

In 2000, the Commissioner amended the introductory paragraph of § 12.00A and Listing 12.05C.  65 Fed.Reg. 50,746 (Aug. 21, 2000).  In explaining the amendments, the Commissioner stated that "[i]n final listing 12.05C . . . we used the word 'an' before the word 'additional' to clarify that the additional impairment must be 'severe' in order to establish 'an additional and significant work-related limitation of function."  65 Fed.Reg. 50,746, 50,754 (Aug. 21, 2000.  Regarding 12.00A, the Commissioner clarified:

we have always intended the phrase [significant work-related limitation of function] to mean that <u>the other impairment is a "severe" impairment, as defined in §§ 404.1520(c) and 416.920(c).</u> . . . Therefore, . . . we revised the fourth paragraph of final 12.00A, which explains how we assess the functional limitations of an additional impairment under listing 12.05C.  <u>The revised paragraph states that we will assess the degree of functional limitation the additional impairment imposes to determine if it significantly limits an</u>

> individual's physical or mental ability to do basic work
> activities; "i.e., is a 'severe' impairment(s), as defined in §§
> 404.1520(c) and 416.920(c).

Id. at 50772 (emphasis added).

The fourth paragraph of 12.00A addresses Listing 12.05 and states:

> The structure of the listing for mental retardation (12.05) is
> different from that of the other mental disorders listings.
> Listing 12.05 contains an introductory paragraph with the
> diagnostic description for mental retardation. It also contains
> four sets of criteria (paragraphs A through D). If your
> impairment satisfies the diagnostic description in the
> introductory paragraph and any one of the four sets of
> criteria, we will find that your impairment meets the listing.
> Paragraphs A and B contain criteria that describe disorders
> we consider severe enough to prevent your doing any
> gainful activity without any additional assessment of
> functional limitations. For paragraph C, we will assess the
> degree of functional limitation the additional impairment(s)
> imposes to determine if it significantly limits your physical or
> mental ability to do basic work activities, i.e. is a "severe"
> impairment(s) as defined in §§ 404.1520(c) and 416.920(c).
> If the additional impairment(s) does not cause limitations that
> are "severe" as defined in §§ 404.1520(c) and 416.920(c),
> we will not find that the additional impairment imposes "an
> additional and significant work-related limitation of function,"
> even if you are unable to do your past work because of the
> unique features of that work.

20 C.F.R. Pt 404, Subpt P, App. 1 § 12.00A (emphasis added).

The regulations cited in paragraph four of 12.05A define a "severe impairment"

as follows:

> If you do not have any impairment or combination of
> impairments which significantly limits your physical or mental
> ability to do basic work activities, we will find that you do not
> have a severe impairment and are, therefore, not disabled.
> We will not consider your age, education, and work
> experience.

20 C.F.R. §§ 404.1520(c) and 416.920(c).

In <u>Banks v. Massanari</u>, 258 F.3d 820 (8th Cir. 2001), *reh'g and reh'g en banc denied* (Nov. 01, 2001)), the ALJ determined that the plaintiff did not present a valid IQ test in order to meet the listed impairment at § 12.05C for mental retardation.  <u>Id.</u> at 823. The district court agreed with the ALJ, and found in the alternative, that even if the IQ scores were valid, the plaintiff's other impairments, while severe, did not meet the second prong of § 12.05C.  <u>Id.</u> at 823-24.   On appeal, the plaintiff focused on the second prong and cited to <u>Cook</u> for the proposition that because the ALJ found that her impairments were severe at step two, she met the second prong of § 12.05C as a matter of law.  <u>Id.</u> at 824.  The appellate court found that a "closer look at <u>Cook</u> and the cases that follow it reveals that this is true only if the finding of severe impairments at step two is based on impairments other than mental retardation."  <u>Id.</u> (citing <u>Bryant</u>, 141 F.3d at 1252).   The court concluded that while the medical evidence in a record may support an ALJ's determination that a plaintiff has severe impairments at step two, at step three, a court must look to see "what about [a claimant's] combination of impairments made them severe and whether the impairments other than her mental retardation impose additional and significant work-related limitations."  <u>Id.</u> at 824-25. The court proceeded to examine the record to determine if any of the impairments claimed by the plaintiff, other than mild mental retardation, imposed additional and significant work-related limitations, and concluded that they did not.  <u>Id.</u> at 825-26. Notably, the Eighth Circuit did not address the amendments to 12.00A or Listing 12.05C and the Commissioner's explanations of these amendments in its decision.[7]

---

[7]    In reaching its decision, the Eighth Circuit relied on <u>Buckner v. Apfel</u>, 213 F.3d 1006 (8th Cir. 2000), <u>Holland v. Apfel</u>, 153 F.3d 620 (8th Cir. 1998), and <u>Hinkle v. Apfel</u>, 132 F.3d 1349 (10th Cir. 1997), all cases which were decided before § 12.00A and Listing 12.05C were amended in 2000.  In each case, the courts found that the plaintiff's mental retardation impairment did not meet Listing 12.05C because his or her other

In Jones v. Barnhart, 335 F.3d 697 (8th Cir. 2003), the plaintiff challenged the ALJ's finding that she lacked the necessary "additional and significant" limitations, required under Listing 12.05C, on the basis that her limitations in speech amounted to the required "additional and significant" limitation which, coupled with her low intelligence, entitled her to SSI benefits.  Id. at 699.  The Eighth Circuit found that the plaintiff's speech impairment was more than "slight or minimal."  Id. at 701.  Further, the court concluded that the speech impairment was condition distinct from her low IQ.  Id. at 701.  Specifically, the court held:

> [G]iven the appropriateness of additional treatment, we cannot see how the speech impairment can fairly be characterized as "slight or minimal." Nor can it be viewed as simply a peripheral effect of her low intelligence, since the problem has persisted from an early age, and specific treatment for the condition has been recommended. The problem is not merely one of cognition (I.Q.), but also of expression (for example, an inability to put words in the proper order). Communications difficulty is a real impairment that limits claimant's employment opportunities to the rare job which requires no regular, responsive communication.

Id.  The Eighth Circuit ordered a remand for the issuance of benefits.  Id.

---

impairments did not impose additional and significant work-related limitations. However, in Buckner, there was no indication in the opinion that the ALJ had determined at Step 2 that the other impairments discussed in the opinion were severe, as defined by 20 C.F.R. §§ 404.1520(c) and 416.920(c).  In Holland, the court stated that while the ALJ "found that she had a severe combination of impairments, including borderline mental retardation, . . . ; mild depression, treatable with antidepressants; a history of lower back strain, with no residual effects; and a medical history which included both a wrist fracture and a hysterectomy accompanied by hormone treatment, neither of which had residual effect, . . . Holland has no significant work-related injury which would satisfy the second prong of § 12.05(C)."  153 F.3d at 621-622.  In Hinkle, after noting that the "second prong of § 12.05C requires that the claimant have 'a physical or other mental impairment imposing additional and significant work-related limitation of function,'" the court stated the "regulations do not define 'significant,' but courts have held that a 'significant limitation' of function for purposes of § 12.05C, is one that has more than a slight or minimal effect on the claimant's ability to perform basic work."  132 F.3d at 1352 (citations omitted).

With this background in mind, the Court now examines the ALJ's determination that Monroe's mild mental retardation impairment did not meet Listing 12.05C. Based on his review of Listing 12.05C, the ALJ concluded that the severe impairment of PTSD did not impose an additional and significant work-related limitation of function on Monroe's severe impairment of mild mental retardation, as both impairments restricted Monroe to simple 3-to-4 step instructions and tasks in unskilled work activity. Tr. 20. As best as this Court can discern, the ALJ has interpreted Listing 12.05C to require that a second severe impairment does not meet the second prong of the listing, if that impairment does not impose additional limitations on a claimant separate from the severe impairment of mild mental retardation. Such an interpretation has some appeal since the plain language of 12.05C requires an "IQ of 60 through 70 <u>and</u> a physical or other mental impairment imposing <u>an</u> additional significant work-related limitation of function." (emphasis added). However, this interpretation runs afoul of the revisions to 12.00A and Listing 12.05C, the Commissioner's explanation of these revisions, and the ALJ's own findings.

As discussed previously, the Commissioner has explained that in Listing 12.05C "we used the word 'an' before the word 'additional' to clarify that the additional impairment must be 'severe' in order to establish 'an additional and significant work-related limitation of function.'" 65 Fed.Reg. 50,746, 50,754 (Aug. 21, 2000). The Commissioner has further explained that 12.00A sets forth how an additional impairment under Listing 12.05C is to be evaluated: "The revised paragraph [four of Listing 12.05C] states that we will assess the degree of functional limitation the additional impairment imposes to determine if it significantly limits an individual's physical or mental ability to do basic work activities; 'i.e., is a 'severe' impairment(s), as

defined in §§ 404.1520(c) and 416.920(c).'" Id. at 50772.  On the other hand, "[i]f the additional impairment(s) does not cause limitations that are 'severe' as defined in §§ 404.1520(c) and 416.920(c), we will not find that the additional impairment imposes 'an additional and significant work-related limitation of function.'"  20 C.F.R. Pt 404, Subpt P, App. 1 § 12.00A.

Based on these statements of the Commissioner and corresponding regulations, an impairment will be deemed to impose an additional and significant work-related limitation of function if the impairment is "severe" as defined by  § 416.920(c).

Consistent with the regulations and explanations by the Commissioner, the ALJ found that:

> At step two the undersigned must determine whether the claimant has a medically determinably impairment that is 'severe' or a combination of impairments that is 'severe' (20 CFR 416.920(c)).  <u>An impairment or combination of impairments is 'severe' within the meaning of the regulations if it is significantly limits an individual's ability to perform basic work activities</u>.  An impairment or combination of impairments is 'not severe' when medical and other evidence establish only a slight abnormality or combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 416.921;Social Securty Rulings (SSRs) 85-28, 96-3p, and 96-4p).

Tr. 17 (emphasis added).

The ALJ went on to conclude that Monroe had two severe impairments: mild mental retardation and PTSD and expressly cited to 20 CFR § 416.920(c).  Tr. 18. Further, he found that these "above impairments cause more than minimal functional limitations."  Id.  By expressly finding that the PTSD was a severe impairment, and that it caused more than "minimal functional limitation, the ALJ was acknowledging that the PTSD significantly limited Monroe's ability to perform basic work activities.  Accordingly,

this Court finds that the severe impairment of PTSD is a qualifying additional limitation, and as such, at Step 3, Monroe's impairment of mild mental retardation met Listing 12.05.  See Rivers v. Astrue, NO. 8:10-CV-314-RMG-JDA, 2011 WL 2581445 at *15 (D.S.C. May 25, 2011) ("Listing 12.05C anticipates that a claimant of limited intellectual ability will be more severely limited, and disabled, when faced with other severe impairments. The "work-related limitation of function" requirement is satisfied when the claimant is determined to have a severe impairment at step two of the evaluation process.") (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00A , citing 20 C.F.R. §§ 404.1520(c), 416.920(c)) (internal citation omitted); MacMillan v. Astrue, 1:07-CV-0959 LEK/VEB, 2009 WL 4807311 at *7 (N.D.N.Y. Dec. 07, 2009) ("However, revisions to paragraph 12.00A have clarified the additional limitation requirement of Listing 12.05C. The regulations now direct an ALJ to assess the degree of functional limitation the additional impairment imposes to determine if it significantly limits the claimant's physical or mental ability to do basic work activities, i.e., is a 'severe' impairment, as defined in §§ 404.1520(c) and 416.920(c). Thus, the regulations indicate that the proper test for evaluating an impairment, other than low IQ, under Listing 12.05C is the same test used at step two of the sequential evaluation to determine whether an impairment is 'severe.'") (marks and internal citations omitted).

It is true that the Eighth Circuit in Banks explained that Cook stands for the proposition that a claimant has met the second prong of § 12.05C as a matter of law if impairments, other than the mental retardation, "impose additional and significant work-related limitations," (258 F.3d at 824-26), and then determined that Bank's impairment of depression, headaches, carpel tunnel syndrome, skull fracture and opioid dependency did not significantly limit Bank's ability to work.  However, the Banks court

did not address the revisions to 12.00A and Listing 12.05C (nor did the cases cited by
Banks as they had had not yet been adopted), and unlike Banks, the ALJ in this case
did conclude at Step 2 that the severe impairments of mild mental retardation and PTSD
"caused more than minimal functional limitations."  Tr. 18.

"Having held, at Step 2, that her enumerated impairments had more than a
minimal effect on her ability to work, the ALJ cannot then determine at Step 3 that they
did not."  Clark v. Astrue, NO. 4:09CV00451 JLH-JWC, 2010 WL 2038221 at *5 (E.D.
Ark. Apr. 27, 2010).  Indeed, to find otherwise would circumvent the principal that an
"additional limitation need not be disabling, but it must have a 'more than slight or
minimal effect on [her] ability to perform work.'"  McNamara, 590 F.3d at 610 (quoting
Sird, 105 F.3d at 403 (internal quotation omitted)).  Consequently, even if this Court had
not determined that Monroe met Listing 12.05C based solely on the ALJ's finding that
she had the severe impairments of mild mental retardation and PTSD, based on his
additional finding that these severe impairments caused more than minimal functional
limitations, the Court must conclude that at Step 2, Monroe met Listing 12.05C.

Additionally, similar to the result in Jones, where the Eighth Circuit concluded
that the plaintiff's speech impairment was not peripheral to her low intelligence, (335
F.3d 697 at 701), this Court finds that Monroe's PTSD is not part and parcel to her low
intelligence.  PTSD is a condition where a person has been "exposed to a traumatic
event," in which he or she experiences or witnesses events that threaten death, serious
injury, or physical integrity, and "the person's response involved intense fear,
helplessness, or horror. Note: In children, this may be expressed instead by
disorganized or agitated behavior."  Diagnostic and Statistical Manual of Mental
Disorders, 467 (4th ed. 2000 Revision) ("DSM-IV").  Further, according to the DSM-IV,

the diagnostic criteria for PTSD include the traumatic event is persistently re-experienced by one or more "recurrent and intrusive distressing recollections of the event;" "recurrent distressing dreams of the event;" "acting or feeling as if the traumatic event were recurring;" "physiological reactivity on exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event;" and the person exhibits "persistent symptoms of increased arousal (not present before the trauma) as indicated by two (or more) of the following:" (1) difficulty falling or staying asleep; (2) irritability or outbursts of anger; (3) difficulty concentrating; (4) hypervigilance; or (5) exaggerated startle response. Id. at 468.

The description and criteria for a diagnosis of PTSD demonstrate that the condition is not one of cognition (low IQ); rather it affects how an individual functions after being subjected to a traumatic event, including the fear an individual continues to feel after the trauma.  Here, the record is clear that Monroe – who was initially diagnosed with PTSD as a result of being repeatedly raped, (Tr. 342), continued to be diagnosed with PTSD through the age of 18 (Tr. 193, 243, 247, 304, 350), was receiving therapy for the condition (Tr. 243, 318) – continued to experience manifestations from the PTSD unrelated to her cognitive state (Tr. 82, 87, 248, 411, 412, 418, 421, 422).  As such, it is evident that impairment of PTSD is distinct from Monroe's low IQ.

Finally, while the ALJ may have concluded that Monroe's impairments (low IQ and PTSD) resulted in the same RFC (a determination made in connection with Step 4), at Steps 2 and 3 the RFC plays no role.  In other words, by focusing on Monroe's ability to perform a certain level of work with certain restrictions, as represented by the RFC determination at Step 4, the ALJ conflated that determination with what he was being

asked to decide at Step 3, which was not to determine "whether the claimant can perform gainful activity," but rather to determine whether the PTSD provides "provides significant work-related limited function."  <u>Maresh</u>, 438 F.3d at 901 (citation and marks omitted).

Having determined that Monroe meets the diagnostic description set forth in the introductory paragraph of § 12.05, has an IQ in the range of 60 through 70, and another severe impairment, PTSD – which by the ALJ and the Commissioner's own definition significantly limits her "physical or mental ability to do basic work activities," (20 C.F.R. §§ 404.1520(c) and 416.920(c)) – this Court finds that she has an impairment that meets the medical criteria of a listed impairment, she "is presumptively disabled, and no further inquiry is necessary."  <u>Shontos</u>, 328 F.3d at 424. Accordingly, the Court finds that the ALJ's decision is not supported by substantial evidence on the record. Monroe's motion for summary judgment should be granted, defendant's motion should be denied, and the case should be remanded to the Commissioner with instructions to award benefits to Monroe.[8]

## VI.    RECOMMENDATION

For the reasons set forth above,

IT IS RECOMMENDED THAT:

1.    Plaintiff's Motion for Summary Judgment [Docket No. 8] be **GRANTED**; and

2.    Defendant's Motion for Summary Judgment [Docket No. 17] be **DENIED**.

---

[8]    Having determined that Monroe is disabled, this Court does not reach her claim that the ALJ's finding that she could work as a certified nurses assistant with a SVP semiskilled level of 4 was not supported by substantial evidence.

3.     This case be remanded to the Commissioner with instructions to award

benefits to Plaintiff.

Dated:        August 4, 2011

s/ *Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **August 18, 2011**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within ten days after service thereof.   All briefs filed under this Rules shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.